**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| VENITIA HOLLINS, Individually and on behalf of all others similarly situated, | ) ) ) |
| Plaintiff(s), | ) ) |
| v. | ) ) |
| REGENCY CORPORATION, et al., | ) ) ) |
| Defendant(s). | ) |

No. 13 C 07686

Judge John J. Tharp, Jr.

**MEMORANDUM OPINION AND ORDER**

Named plaintiff Venitia Hollins was a cosmetology student enrolled at the Regency Beauty Institute, which is owned and operated by defendant Regency Corporation ("Regency").[1] Hollins sues individually and on behalf of a class seeking to recover unpaid wages under the Fair Labor Standards Act, 29 U.S.C. § 201 (FLSA) and related Illinois and Indiana wage payment statutes. As the curriculum required, while enrolled at Regency Beauty Institute, Hollins performed various cosmetology services for paying customers. She alleges that performing these services transformed her from Regency's student to Regency's "employee" within the meaning of the FLSA, and that she is thus entitled to compensation. Regency moves for summary judgment arguing its students do not fall within the purview of the FLSA. For the following reasons, Regency's motion is granted.[2]

---

[1] Jennifer Chounard, originally another named plaintiff, voluntarily dismissed her claim after she failed to list the claim on her schedule of assets after filing for bankruptcy and receiving a discharge in bankruptcy. Dkt. 86 and 92.

[2] The plaintiffs' motion to conditionally certify a collective action, Dkt. 9, is denied without prejudice as moot.

**Background**

**A. Regency's Curriculum**

Regency operates state licensed and accredited cosmetology schools throughout the country, including in Illinois and Indiana. DSOF ¶ 1. Regency's stated educational goals are to prepare students to pass the required state cosmetology exams and to teach them the entry-level skills needed to work in a professional salon. DSOF ¶ 17. Regency is a fully accredited for-profit, private cosmetology school.

As an accredited cosmetology school, Regency is governed by detailed state regulations and the National Accrediting Commission of Career Arts & Sciences ("NACCAS"). DSOF ¶¶ 7-15. In both Indiana and Illinois, these regulations require that Regency's curriculum comprise at least 1500 hours of "clock time" and cover the chemical treatment of hair, hair styling, nail technology, shop management, and other cosmetology-related subjects. 68 Ill. Admin Code § 1175.530; 820 Ind. Admin Code §§ 4-4-4; DSOF ¶¶ 14-15. These regulations also require that students receive instruction on proper sanitation techniques and best practices. 620 Ill. Admin Code § 1175.505 (c); 820 Ind. Admin Code §§ 3-1-1; DSOF ¶ 13. Both the NACCAS and state law require that this instruction take the form of both classroom and practical learning methods. DSOF ¶ 59. As such, Regency requires that students practice sanitizing all instruments before and after each use, using clean towels on each model, and ensuring that the floors, walls, and furniture are kept clean at all times. Examples of appropriate practical learning methods listed by the NACCAS include "student salon activities," and much of Regency's practical training occurs in such an environment. DSOF ¶ 59.

To comply with these statutory requirements and to accomplish its teaching objectives, Regency divides its 1500-hour curriculum into three periods: the workshop phase, the rehearsal

phase, and the performance phase. DSOF ¶ 20. The workshop phase consists of 320 hours of introductory education on the various subjects Regency is required to teach under Indiana and Illinois state law. DSOF ¶ 22. To move from the workshop phase into the rehearsal phase, students must successfully pass a battery of written and performance-based tests. After successfully completing the exams, students then rotate between the rehearsal phase—which consists of additional classroom instruction—and the performance phase.

Following the workshop phase, students spend the first two days of the week in classroom for the rehearsal phase, where they study the principles of hair design, hairstyling, haircutting, professional development, and business building. DSOF ¶ 25. For the remaining three days of the week, the students are on Regency's "performance floor" for the performance phase. DSOF ¶ 29. Regency admits that the performance floor is designed to replicate a modern salon, but contends that it is not in fact an actual salon. DSOF ¶ 29. In many ways, however, the performance floor is indistinguishable from a fully licensed commercial salon. The students perform cosmetology services on paying customers, describe and recommend products and services to the same customers, and book their appointments. They are also required to conduct safety and sanitation practices, which often requires the students to clean the salon areas, including the salon restrooms. PSOF ¶ 18. Although the students are not paid, for each minute they spend on the floor during the performance phase, students receive "practical service" credit toward graduation. DSOF ¶ 39. Oftentimes the students are required to be on the performance floor on weekends, or they face a monetary penalty. PSOF ¶ 28.

Regency charges customers a fee for the student provided services. DSOF ¶ 44. But Regency sets the prices for the services at a rate that is considerably lower than the rates offered by licensed cosmetologists. PSOF ¶ 32. It is undisputed that from these below-market fees

Regency generated total revenue of $9,651,580 in 2011; $10,725,731 in 2012; and $10,700,000 in 2013. PSOF ¶ 3. This accounted for roughly 10% of all of the company's revenue during the same periods. PSOF ¶ 3. The amount of profit made by the Regency from the salons is subject to dispute, however. The plaintiffs contend that performance floor sales accounted for 76.36% of Regency's profits. PSOF ¶ 10. But Regency argues that in calculating this figure the students are comparing the total **revenue** obtained from performance floor sales (which does not deduct expenses) with Regency's total **profit** (which is revenue, less expenses) made during the same three-year period. *Id.* Regency further asserts that operating expenses from the performance floors actually exceeded the total guest-service and product-sales revenues. PSOF ¶ 10.

### B. Hollins' Enrollment at Regency

In January 2011, Hollins enrolled as a full-time cosmetology student at Regency's Merrillville, Indiana location; she later transferred to Regency's school in Tinley Park, Illinois location, where she graduated in April 2012. DSOF ¶ 3. Hollins completed the curriculum discussed above and, after passing the requisite licensing exam, began working as a cosmetologist. She has continuously worked in two salons and runs her own separate cosmetology business on the side. Hollins testified that she was very satisfied with her overall experience at Regency "relative to her expectations" and that her education there prepared her for employment in the cosmetology industry. She added that the skills taught at the Regency are portable to a variety of different jobs within the field. DSOF ¶ 78. DSOF ¶ 66.

With respect to her time on the performance floor, Hollins stated she understood that she would not be compensated for her time spent working with paying customers. DSOF ¶¶ 79-80. She even went as far as saying that, to her, it was a matter of "common sense" that she would not be paid by Regency. DSOF ¶ 80. She also acknowledged that Regency did not guarantee that she

would be employed upon graduation. DSOF ¶¶ 79-80. She now contends, however, that while they were practicing the techniques learned in the rehearsal phase—and earning credit hours required by state law—she and her peers were not Regency's students, but were rather Regency's employees and, accordingly, should have been paid for their work on the performance floor.

## Discussion

Hollins claim relates to the time she spent on the Regency performance floor practicing cosmetology techniques on paying customers. She contends these activities entitled her to wages under the FLSA.[3] Regency now moves for summary judgment, arguing that Hollins and other students were not "employees" within the meaning of the FLSA and related state law. To prevail on a summary judgment motion, the movant must demonstrate that there is no genuine dispute as to any material fact and that she is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). In deciding Regency's motion for summary judgment the Court construes all disputed facts and draws all reasonable inferences in favor of the students, who are the nonmoving party. *Love v. JP Cullen & Sons, Inc*., 779 F.3d 697, 701 (7th Cir. 2015).

---

[3] The FLSA requires employers to pay all "employees" a set minimum wage and an overtime wage for all hours worked in excess of forty hours per week. 29 U.S.C. §§ 206-07. In addition, the plaintiffs assert four additional state law claims. First, Hollins brings claims under the Illinois Minimum Wage Law and the Illinois Payment and Collection Act. She agrees, however, that the Illinois Payment and Collection Act claim should be dismissed outright, and that the Illinois Minimum Wage Law claim will rise or fall with their FLSA claim. *Condo v. Sysco Corp*., 1 F.3d 599, 601 (7th Cir. 1993); Pls.' Resp. at 24. Second, Hollins brings claims under the Indiana Wage Payment Statute and the Indiana Wage Claims Statute. Both of these statutes, however, require an independent statutory source for wages, such as the FLSA. Thus, the viability of these claims will also hinge on the analysis of the students' FLSA claim. *Kellar v. Summit Seating, Inc.,* 664 F.3d 169, 178 (7th Cir. 2011); *Perry v. Bath & Body Works, LLC,* 993 F.Supp. 2d 883, 918 (N.D. Ind. 2014).

Although there are a number of disputed facts on the record presented, they are largely immaterial because whether Regency's students are "employees" as defined by the FLSA is a legal question. *See*, *e.g.*, *Sec. of Lab., U.S. Dept. of Lab. v. Lauritzen*, 835 F.2d 1529, 1535 (7th Cir. 1987) (finding that "employee" status under the FLSA is a question of law). Ultimately, Regency's motion requires the Court to weigh competing interpretations of the term "employee" within the meaning of the FLSA. Arguing for an application of the "economic realities" test, Regency contends that the totality of the circumstances illustrates that the students received the primary benefit of their relationship with Regency, and thus were not the school's employees. In response, Hollins offer two arguments that are articulated in a variety of ways throughout her opposition brief. She contends that by charging performance floor customers below-market rates for student provided services, Regency is displacing licensed cosmetologists who charge full price for that same service. Pls.' Resp. to Def.'s Summ. J. Mot. at 5-11. Hollins argues that because one of the purposes of the FLSA is to prevent "unfair competition," classifying the students as employees is necessary to prevent "displacement," and to further that purpose. *Id.* She also contends that because the school allegedly incurred an economic benefit from the students' performance floor activities, the students were necessarily employees. *Id.* at 13-19. For the reasons stated below, the Court finds her arguments unpersuasive.

Although the text of the statute is the starting point for a determination of whether Hollins and her fellow students qualify as employees under the FLSA, the statute itself does not provide an answer because its definition of employee is circular: an employee is one who is employed by an employer. 29 U.S.C. § 203(e). To determine whether someone is an FLSA "employee," then, the Seventh Circuit has instructed district courts to assess the "economic reality" of the relationship between the proffered employee and his alleged employer. *Vanskike*

*v. Peters*, 974 F.2d 806, 808 (7th Cir. 1992) (citing *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961)). But what are the "economic realities" that distinguish whether one should be subject to the minimum wage? In some sense, this instruction is no more helpful than the FLSA's circular definition of employer; it merely begs the question. *Solis*, 642 F.3d at 522-23. It does not help much to add that the economic reality analysis is a pragmatic inquiry that depends on the "totality of the circumstances rather than any technical label." *Id.*

In an effort to focus the inquiry on factors that distinguish an employee from an independent contractor for FLSA purposes, the Seventh Circuit has endorsed the "six-factor test" set forth in *Lauritzen*, 835 F.2d at 1534-35. *See also Estate of Suskovich v. Anthem Health Plans of Virginia, Inc.*, 553 F.3d 559, 565 (7th Cir. 2009).[4] The Circuit Court's embrace of the

---

[4] As set forth in *Lauritzen*, the factors relevant to an analysis of the economic realities of a relationship between worker and payor are:

> 1) the nature and degree of the alleged employer's control as the manner in which the work is to be performed;
>
> 2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;
>
> 3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers;
>
> 4) whether the service rendered requires a special skill;
>
> 5) the degree of permanency and duration of the working relationship; and
>
> 6) the extent to which the service rendered is an integral part of the alleged employer's business.

835 F.2d at 1535. Most of these factors relate to the question of the degree of control exercised by the putative employer, which is of great significance when the question presented is whether a worker is an employee or an independent contractor, but is less significant in the context of the

*Lauritzen* six-factor test appears tentative, however, as evidenced by the fact that *Lauritzen* actually posited a seven-factor test[5] and because despite its endorsement of the test in *Estate of Suskovich*, the Court of Appeals did not apply it, opting instead to employ a *ten* factor test set forth in the Restatement (Second) of Agency because the case also presented narrower common law and ERISA claims. *See* 553 F.3d at 565-66.[6] And in *Vanskike*, the Court appeared to disdain formal consideration of the *Lauritzen* factors in concluding that the unique relationship between the state and prisoners so completely removed the question from the normal context of private consensual economic relationships as to render the FLSA inapplicable. 974 F.2d at 812 ("*Vanskike* was not in a true economic employer-employee relationship with the DOC, so the statutory language does not cover him."). Thus, although the Seventh Circuit has clearly directed district courts to consider the economic realities of the relationship in assessing whether a worker is an employee covered by FLSA, it does not appear to have provided a definitive analytical framework by which district courts must conduct that analysis.

---

question presented here, namely whether FLSA covers student interns for work they perform as part of a requirement for completion of their course of study.

[5] In addition to the six factors it initially identified, in *Lauritzen* the court also considered the degree to which the workers were economically dependent upon the putative employer. The incorporation of this additional factor is particularly confusing in the context of the opinion's statement that "no criterion is by itself, or by its absence, dispositive or controlling" of the characterization of the relationship, 835 F.2d at 1534, because it essentially held out economic dependence as the *sine qua non* of an employment relationship: "Economic dependence is more than just another factor. It is instead the focus of all the other considerations." *Id.* at 1538 (quoting *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1311-12 (5th Cir. 1976), which stated that "It is dependence that indicates employee status.").

[6] As the Seventh Circuit explained, "there are slightly different tests" for whether a worker is an employee under the common law, under ERISA, and under FLSA. 553 F.3d at 565.

Moreover, as *Vanskike*'s treatment of the issue suggests, the context of the relationship under examination is critical. Here, as in *Vanskike*, the context is not a conventional economic relationship in which one party provides a service and the other pays for it; although the comparison may make Regency squirm, there is an analogy to be drawn between the work performed by prisoners and by students because in both cases that work is a component of required training for the workers. That component—the need for training—further complicates the analysis of the "economic reality" of the relationship between vocational students and a school or business that uses their services.

The Seventh Circuit has not had occasion to consider the economic realities of the relationship between student trainees and a business that makes use of their services, but as both parties suggest in their briefs, that assessment should begin with the Supreme Court's seminal opinion *Walling v. Portland Terminal Co.*, 330 U.S. 148 (1947). In *Portland Terminal*, the Court held that unpaid trainees who participated in a brakeman training program, offered by the defendant railroad company, were not employees within the meaning of the FLSA. *Id.* at 149. The program, which lasted approximately one week, consisted of the trainees performing the actual work of brakemen under the instruction and supervision of the defendant's permanent yard crew. *Id.* The court indicated that "[w]ithout doubt the [FLSA] covers trainees, beginners, or learners if they are employed to work for an employer for compensation." *Id.* at 151. But in finding the trainees were not employees within the meaning of the FLSA, the Court observed that the FLSA was "obviously not intended to stamp all persons as employees who, without express or implied compensation agreement, might work for their own advantage on the premises of another." *Id.* at 152. Because the railroad received "no immediate advantage" from any of the work done by the trainees, the Court determined the railroad should not be penalized

for providing free vocational instruction that most benefited the trainee, rather than the trainer. *Id.* at 153. Put differently, the Court found that a student who attends a program to learn a skill or trade that they could take to gain employment elsewhere, while providing little or no benefit to the trainer, is the primary beneficiary of the relationship and cannot be the trainer's "employee." *See id.* at 152-53.[7]

Recently, in *Glatt v. Fox Searchlight Inc.*, the Second Circuit applied *Portland Terminal* to a class of unpaid student interns who argued they were employees under the FLSA. 791 F.3d 376, 383 (2d Cir. 2015). The students, some of whom were receiving academic credit for the

---

[7] In an attempt to flesh out the *Portland Terminal* decision, the Department of Labor has laid out a six-factor test that purportedly distinguishes between employees and unpaid trainees. *See* DOL, Wage & Hour Div., Fact Sheet # 71, Internship Programs Under The Fair Labor Standards Act (April 2010), available at http://www.dol.gov/whd/regs/compliance/whdfs71.pdf. The DOL concludes that an employment relationship does not exist if all of the following factors apply: (1) the internship, even though it includes operation of the facilities of the employer, is similar to training which would be given in an educational environment; (2) the internship benefit is for the benefit of the intern; (3) the intern does not displace regular employees, but works under close supervision of existing staff; (4) the employer that provides the training derives no immediate advantage from the activities of the intern; and on occasion its operations may be impeded; (5) the intern is not necessarily entitled to a job at the conclusion of the internship; (6) the employer and the intern understand that the intern is not entitled to wages for the time spent in the internship. *Id.* As the plaintiff notes, no circuit presented with the question before the Court today has outright adopted the DOL factors, and neither party advocates for its application here. *Schumann v. Collier Anesthesia*, P.A., No. 14-13169, 2015 WL 5297260, at *6-8 (11th Cir. Sept. 11, 2015) (rejecting DOL factors in favor of primary benefit test); *Glatt v. Fox Searchlight Pictures, Inc.,* 791 F.3d 376, 383 (2d Cir. 2015) (in finding the DOL factors as unpersuasive, noting that the DOL factors attempt "to fit *Portland Terminal*'s particular facts to all workplaces, and…is too rigid"). Given that the test was not born from a formal rulemaking proceeding, it at most receives *Skidmore* deference; meaning that the DOL guidelines deference is limited by their "power to persuade." As noted in the Second Circuit, because the DOL is an agency that "has no special competence or role in interpreting a judicial decision" the Court elects to obtain its guidance from *Portland Terminal* and its prodigy directly, rather than from DOL. *See Glatt,* 791 F.3d at 383. Nevertheless, the factors identified by the DOL, which it distilled from *Portland Terminal,* are largely compatible with the factors the Second Circuit identified in *Glatt v. Fox Searchlight Inc.* , 791 F.3d 376, 383 (2d Cir. 2015), which the Court discusses below.

internship, worked on the defendant's movie set performing various production-related tasks for no pay. *Id.* at 379-380. Recognizing that the Supreme Court has not yet addressed the status of student workers under the FLSA, the Second Circuit aptly recognized that *Portland Terminal* was the most analogous federal precedent to the modern student intern/clinical experience. *Id.* at 381-82. Yet, it also recognized that it did not accurately "reflect a central feature of the modern internship—the relationship between the internship and the intern's formal education." *Id.* at 385. In order to align *Portland Terminal* with the modern learning experience, the Second Circuit identified a set of factors for lower courts to consider when determining when unpaid-student workers were actually employees covered by the FLSA.[8] These factors include:

> 1. The extent to which the intern and the employer clearly understand that there is no expectation of compensation.

> 2. The extent to which the internship provides training that would be similar to that which would be given in an educational environment.

> 3. The extent to which the internship is tied to the intern's formal education by integrated coursework or the receipt of academic credit.

> 4. The extent to which the internship accommodates the intern's academic commitments by corresponding to the academic calendar.

> 5. The extent to which the internship's duration is limited to the period in which the internship provides the intern with beneficial learning.

> 6. The extent to which the intern's work complements, rather than displaces, the work of paid employees while providing significant educational benefits to the intern.

---

[8] Many of these factors are analogous to the factors identified by Regency in its opening brief, which was filed before the Second Circuit issued its opinion in *Glatt*. Def.'s Mot. for Summ. J. at 10-17.

7. The extent to which the intern and the employer understand that the internship is conducted without entitlement to a paid job at the conclusion of the internship.

The Second Circuit reiterated that the above approach was "flexible" and consistent with the teachings of *Portland Terminal*. The court observed that these factors appropriately balance the benefits of clinical programs, which "are widely supported by educators and by employers looking to hire well-trained recent graduates," with the risk that "employers can also exploit unpaid interns by using their free labor without providing them an appreciable benefit or experience." *Id.* at 382-83. Applying this framework to discern the economic realities of the intern-business relationship, the court concluded, will enable courts to assess, consistent with Portland Terminal's emphasis, "whether the intern or the employer is the primary beneficiary of the relationship." *Id.* at 382.[9]

Even more recently, the *Glatt* factors were endorsed by the Eleventh Circuit in *Schumann v. Collier Anesthesia*. No. 14-13169, 2015 WL 5297260, at *10 (11th Cir. Sept. 11, 2015). In *Schumann*, much like Hollins and her fellow cosmetology students, the plaintiff nurses sought to recover unpaid wages for work performed during their clinical hours that were associated with a graduate nurse anesthetist program offered by a for-profit university; completion of the program was a prerequisite to obtaining a professional license in anesthesiology. *Id.* at 1. Under the relevant accrediting institution's standards, accredited schools had to require students to participate in a minimum of 550 clinical cases in a variety of surgical procedures. *Id.* In performing these procedures, the students were also tasked with re-stocking surgical carts,

---

[9] The Second Circuit vacated the district court's finding that the interns were employees and directed the court to reevaluate their FLSA status under the above factors.

preparing surgical rooms for use, and cleaning equipment. *Id.* at 2. In short, the students were required to perform all the duties that a licensed nurse anesthetist would be expected to do. *Id.* The assigned tasks tracked the students' classroom studies, and they were evaluated by their supervisor upon the completion of each task. *Id.* The students received no compensation for their services. *Id.*

Noting that *Portland Terminal* presented a situation that involved a relatively short training program that developed the defendant's own labor pool, which did not accurately reflect the modern student-clinical experience, the *Schuman* court fully endorsed the factors outlined by the Second Circuit in *Glatt*. *Id.* at 9. The court observed that conspicuously missing from the *Glatt* factors, however, is *Portland Terminal*'s reference to the trainer receiving "no immediate advantage" from the trainees' activity. *Portland Terminal Co*., 330 U.S. at 153 ("Accepting the unchallenged findings here that the railroads receive no 'immediate advantage' from any work done by the trainees, we hold that they are not employees within the Act's meaning."). But in finding the lack of an "immediate advantage" requirement irrelevant, the Eleventh Circuit added that "the training in *Portland Terminal* was so different than the modern internship for academic, certification, and licensure purposes" that the "immediate benefit" consideration was pointless because the **students' needs** were driving the need for the internship/clinical experience to exist in the first place, rather the **trainer's need** for labor. *Id.* at 11. Thus, any benefit obtained by the trainer was merely incidental to the student's need for the experience to begin with.

In the absence of Seventh Circuit authority that addresses the context of the relationship between student interns and a business that uses their services, the Court concludes that the *Glatt* factors shed substantial light on the pertinent "economic realities" of the relationship shared by clinical students and their schools. The dilemma in the modern clinical experience is that both

13

the student and the trainee are potentially receiving significant benefits from the student's clinical experience, which could open up the opportunity for trainers to take unfair advantage of the students' services. Thus, a properly conducted economic realities inquiry requires the court to balance the benefits obtained by both the trainer and the student, while keeping in mind the risk of trainer abuse. *Id.* at 10. The *Glatt* factors put this required gloss on *Portland Terminal* and harmonize its reasoning with the facets of the modern clinical experience.

Applying the *Glatt* factors to the case at hand, and keeping in mind that no factor alone is determinative, the Court concludes that the students were the primary beneficiaries of the Regency clinical program, and any benefit received by Regency was not obtained in a way that "takes unfair advantage of or is otherwise abusive towards the student." *Schumann*, 2015 WL 5297260, at *9. Each of the factors is discussed below:

**1. No expectation of compensation.** Hollins concedes there was no expectation that she would receive employment or compensation from Regency. DSOF ¶ 80. Under *Glatt's* first factor, the absence of any expectation of compensation suggests that there was not an employment relationship for purposes of a minimum wage law. *Glatt*, 791 F.3d at 384 (a "promise of compensation, express or implied" may suggest an employment relationship—"and vice versa"). This analysis is consistent with *Portland Terminal*, where the court highlighted the fact that nothing indicated the "railroad ever undertook to pay, or the trainees ever expected to receive, any remuneration for the training period." *Portland Terminal Co*., 330 U.S. at 150. Here, Hollins concedes she understood there would be no compensation for her time spent on the performance floor working with paying customers. DSOF ¶¶ 79-80. At the time, Hollins viewed it as a matter of "common sense" that she would not be paid by Regency for the services she practiced on paying customers. DSOF ¶ 80. Hollins also acknowledged that her attendance at

Regency did not amount to a guarantee that she would be employed upon graduation by anyone, much less Regency. The only expectation that Hollins had was that Regency would train her to a level that would prepare her to take and pass the state cosmetology exam, which she did. DSOF ¶¶ 67, 75.

   **2. Similarity between clinical/internship experience and classwork.** It is apparent that the techniques the students practiced on paying customers were similar to those that they would have performed in a classroom setting. *Glatt*, 791 F.3d at 384. If the clinical work or externship provides a learning experience that is similar to what would be given in a formal-educational environment, the students are likely not employees. *Id.* This factor is also consistent with *Portland Terminal*, where the court found it relevant that the railroad was offering training that was essentially the same training the students would receive in a vocational school. *Portland Terminal Co.*, 330 U.S. at 153. In *Portland Terminal* the Court observed that "[h]ad these trainees taken courses in railroading in a public or private vocational school, wholly disassociated from the railroad, it could not reasonably be suggested that they were employees within the meaning of the Act." *Id.* at 152-53.

   Here, too, this factor points strongly in the direction that Regency's students were not employees within the meaning of the FLSA. Not only was the clinical work performed by the students on the performance floor consistent with what is **statutorily required** to be performed at a cosmetologist school, *Regency is* the sort of vocational school where the students are required by law to be trained. As an accredited institution, Regency's facilities were screened thoroughly by the NACCAS to ensure that its curriculum was in compliance with cosmetology school accrediting standards. DSOF ¶ 58. As part of these criteria, Regency is required to provide

students with both "academic and practical learning methods."[10] DSOF ¶ 59. In this vein, in order to ensure students' performance floor activities relate to and build upon their classroom instruction, Regency integrates classroom instruction and practical application via the "rehearsal phase," which consists of two days a week of classroom instruction relating to the various cosmetology subjects that are tested on the state licensing exam. DSOF ¶¶ 24-26. After completing the rehearsal phase for the week, students then spend three days on the performance floor practicing the techniques learned during the rehearsal phase. Thus, not only are the students' performance floor activities similar to the activities they would be performing in a classroom, but via Regency's integrated teaching approach they in fact become one in the same.

Hollins contends that some of the tasks performed on the sales floor lacked educational value because they were not closely related to the practice of cosmetology. Pls.' Resp. to Def.'s Summ. J. Mot., at 18-19. In other words, she argues that the tasks performed on the performance floor were not the same tasks they would have performed in a classroom setting. For example, students were required to act as receptionists who interacted with customers, clean and sanitize the performance floor, sell salon product, and to restock cosmetology products as needed. PSOF ¶¶ 17-20. Because these assignments did not involve performing services on live models the plaintiffs contend they had no educational value. *Id.* But the practice of cosmetology, as with any profession, is more involved than just delivering an endgame service or product to the customer. In her own deposition, Hollins indicated it was important for a successful cosmetologist to "know how to sell beauty services and retail products." DSOF ¶ 50. Relatedly, at first blush sanitizing the performance floor area may indeed seem to be "janitorial work," as Hollins

---

[10] The NACCAS lists the use of "student salon activities" as an example of an acceptable "practical learning method." DSOF ¶ 59.

contends, but "Salon Safety and Sanitation" is the most heavily tested subject area on the Illinois and Indiana cosmetology licensing exam, representing nearly a third of the total test. DSOF ¶ 35. To prepare students for this exam, the NACCA requires Regency to use "practical learning methods" throughout their curriculum, which would include the portion on salon safety and sanitation. *See* DSOF ¶ 59. Hence, because the students were tasked with activities on the performance floor that were closely connected with their state mandated curriculum, the second *Glatt* factor cuts in favor of finding the students were not employees.

**3. Receipt of academic credit**. That a student's internship or clinical experience tracks their classroom coursework, or qualifies for academic credit, is another significant indicator that the services provided should be viewed in the first instance as part of an academic relationship between student and educational institution rather than as a conventional employment arrangement in which a putative employer offers compensation to workers for the primary purpose of earning a profit from those services. *Glatt*, 791 F.3d at 383; *See Schumann v. Collier Anesthesia, P.A.*, 14-13169, 2015 WL 5297260, at *10 (11th Cir. Sept. 11, 2015); *Kaplan v. Code Blue Billing & Coding, Inc.*, 504 Fed. Appx. 831, 834 (11th Cir. 2013) (unpublished) (finding student interns were not employees within the meaning the FLSA in part because they received academic credit for their internship). For example, in *Kaplan* the plaintiffs were students enrolled in a medical billing and coding specialist program who were required to complete an externship with an offsite billing company after completing their classroom work. 504 Fed. Appx. at 833. In finding the students were not employees, the court noted that the students were receiving academic credit for completing the internship, thus satisfying a graduation requirement. *Id.* at 834

Similarly here, it is undisputed that Regency's students received academic credit for every minute of work they performed on the sales floor. DSOF ¶ 31. These credit hours were crucial to the students' education, as state law required that they receive at least 1500 hours of classroom and practical instruction before taking the licensing exam, and the time they spent on the performance went towards fulfilling that requirement. DSOF ¶¶ 6, 21. The nexus between the activities performed on the performance floor with the students' academic coursework is further strengthened by Regency's imposition of a rehearsal phase, which provided additional classroom instruction that tracked the students' performance floor coursework. DSOF ¶¶ 24-26.

The plaintiffs attempt to distinguish *Kaplan*, and to undercut the significance of the academic credit they received for their performance floor time, by pointing to the *Kaplan* court's finding that the internship provider did not incur any benefit from the students' services. Pl.'s Resp. at 21. The plaintiff argues that because Regency obtained an economic benefit from the performance floor, the *Kaplan* analysis is inapposite. But Hollins overlooks the differences in the internship program at issue in *Kaplan* and the clinical experience offered at Regency. In *Kaplan*, the students performed their internship at a private billing company that was not in the business of providing educational opportunities; it was in the business of providing billing services. 504 Fed. Appx. at 833. At Regency, the performance phase is conducted on campus as an integral part of the students' curriculum, and the students' need for the experience is the raison d'être for the performance floor; there is no basis to infer that Regency would provide salon services to the public in the absence of the requirement to provide clinical experience to its students. Any benefit obtained by Regency is, therefore, only derivative of the students' own benefit obtained from the performance floor. As the Tenth Circuit recognized "the mere fact that [a school] may have derived some economic value from [student activities] does not override the [students']

18

educational benefits and is not dispositive of the 'employee' issue." *Marshall v. Regis Educ. Corp.*, 666 F.2d 1324, 1327 (10th Cir. 1981); *see also Schumann* 2015 WL 5297260, at *9 ("Indeed, there is nothing inherently wrong with an employer's benefiting from an internship that also plainly benefits the interns."). Here, the fact the students received required credit hours down to the very minute they spent on the performance floor illustrates that the economic reality of the relationship between Regency and the students was that of a student-trainer, not an employee-employer.

**4. Work tied to the academic calendar.** If the activities of the internship or clinical experience correspond with the academic calendar then the student's activity is indicative of a student-trainee relationship. *Glatt*, 791 F.3d at 384; *Schumann*, 2015 WL 5297260 at *10. But in situations where "the clinical training and the academic commitment are one in the same, this consideration must account for whether a legitimate reason exists for clinical training to occur on days when school is out of session." *Schumann*, 2015 WL 5297260, at *10. Here, Hollins' time on the performance floor was integrated into the rest of her cosmetology curriculum, indicating that her practical training tracked the academic calendar. DSOF ¶¶ 24-26. But Hollins does note she was required to spend time on the performance floor on scheduled Saturdays for a minimum of three hours, presumably when rehearsal phase classes were not in session. Pl.'s Resp. at 18; PSOF ¶ 28. She argues that Regency had no legitimate reason for requiring the students to work weekends and simply did so because Saturdays were the "busiest day in the salon," and that it "relieved Regency the burden of hiring paid employees." Pl.'s Resp. at 18-19; PSOF ¶ 28. She adds that this resulted in Regency's "subordination of its students' educational goals to Regency's goal of earning salon revenues." Pl.'s Reps. at 18. But the students' educational goals were to become licensed, proficient cosmetologists, which required ample practical application

19

opportunities. As Hollins concedes, live models—as opposed to mannequins—provided a more fulfilling learning experience, PSOF ¶ 22, and the purpose of Regency's performance floor was to provide the students with those models in the form of paying customers. *See* DSOF ¶¶ 30-31. Given that Hollins concedes that Saturday's were the performance floor's busiest day, required Saturday attendance likely **furthered** the students educational goals, as it provided students with the greatest supply of customers and variety of experience possible. Thus, Regency had a legitimate reason for requiring students to attend clinical sessions during the performance floor's busiest hours.

**5. Length of internship/clinical experience.** *Glatt* instructs courts to analyze the extent to which the internship's duration is limited to the period in which the internship provides the intern with beneficial learning. 791 F.3d at 384. If the externship or clinical experience extends so far as to no longer realistically further the students' educational goals, then the economic realities might be indicative of an employee-employer relationship. *Id.* Elaborating on this point, the Eleventh Circuit noted that "this consideration must recognize the goals of the internship and determine whether the duration of the internship is necessary to accomplish them…[w]e cannot expect that the length of the internship will always match up perfectly with the skills to be taught and the experience to be gained through the program." *Schumann*, 2015 WL 5297260 at *11.

But here it does. The state requires cosmetology students to complete 1500 hours of total coursework; Regency required no more. DSOF ¶ 19. 68 Ill. Admin. Code § 1175.530; 820 Admin. Code §§ 4-4-4. Given that one of the stated goals of Regency's curriculum was to prepare its students for the appropriate cosmetology licensing exam, it is readily apparent that Regency's 1500 hour requirement was consistent with the students' educational goals. *See* DSOF ¶ 17.

**6. Displacement.** Both *Glatt* and *Portland Terminal* instruct courts to analyze the extent to which the students' work complements, rather than displaces, the work of paid employees. *Portland Terminal*, 330 U.S. at 150; *Glatt*, 791 F.3d at 384. If the students' activities displace the trainers' regular fulltime employees, then the economic realities might indicate the existence of an employee-employer relationship. *Glatt*, 791 F.3d at 384. In *Portland Terminal*, in finding the railroad trainees were not employees, the Court noted that none of the trainees' activities "displace[d] any of the ***regular*** employees, who do most of the work themselves, and must stand immediately by to supervise whatever the trainees do." 330 U.S. at 150 (emphasis added); *see also Solis v. Laurelbrook Sanitarium and Sch., Inc.*, 642 F.3d 518, 530 (6th Cir. 2011) (in finding students were not employees, court noted they did not displace defendant's compensated staff). Here, it is undisputed that Regency had no regular employees performing cosmetology services on the performance floor. Hence, Hollins does not allege Regency's students displaced any of Regency's paid cosmetologists, because Regency has none.

Instead, Hollins argues that Regency's performance floor displaced, or "outcompeted," paid cosmetologists in two other ways. First, she contends that "[w]ithout the labor provided by [students], [Regency]…would either cease to operate or would have to secure labor from other persons who would have to be compensated." Pls.' Compl. at ¶ 25. Put differently, the students argue that by using them on the performance floor Regency is displacing ***labor*** from a hypothetical employee that they would otherwise have to hire to perform the same service. *See id.* A similar argument was presented and rejected by the district court in *Solis v. Laurelbrook*, No. 1:07-CV-30, 2009 WL 2146230, at *3 (E.D. Tenn. July 15, 2009) *aff'd*, 642 F.3d 518 (6th Cir. 2011). There the Department of Labor argued that the defendant religious non-profit that existed to train troubled youth in various vocational skills displaced professional workers in

those same fields. In rejecting this argument, the district court observed that "[i]f there was no school there would be no [clinical program] and the students would not be working there. Therefore, students do not displace any adult employees or others that might be willing to work in a nursing home." *Id.* at 3. In affirming the legal conclusions of the district court, the Sixth Circuit noted that as a school, the defendant was not in "competition with other institutions for labor," so no displacement of labor occurred. *Solis,* 642 F.3d at 530. Similarly here, as a vocational institution that trains future cosmetologists, Regency is not in the business of hiring licensed cosmetologists to work on the performance floor. The performance floor exists only because it is needed to train students. As with the training program in *Solis*, no displacement of labor is occurring.

But even if the court were to extend *Portland Terminal*'s displacement rationale from an employer's **regular** employee to its ***potential*** employees, Hollins' argument would still miss the mark. As Regency notes, both Indiana and Illinois state law **prohibit** cosmetology schools from permitting anyone other than students from performing cosmetology services at the school. *See* 225 ILCS 410/3D-5(a); 820 Ind. Admin. Code § 4-2-1 (a). Thus, because Regency is a cosmetology school, as a matter of law, they cannot hire an employee to perform the same cosmetology services that Regency's students do, making it legally impossible for the students to displace any potential employees. *See id.*

Second, Hollins attempts to take *Portland Terminal*'s displacement rationale a step further by contending that the performance floor displaces licensed cosmetologists working for salons that charge market rates. Pls.' Resp. at 7. According to Hollins, by charging below-market rates for cosmetology services, Regency is "unfairly competing" in the marketplace and displacing ***business*** that would otherwise go to other salons. *Id.* Because this is counter to the

22

purposes of the FLSA, the she contends, the Court should find an employment relationship exists even if one would not normally exist "under the common law." *Id.*

In support of this proposition, Hollins points to *Vanskike*, but the case actually undermines her argument. In *Vanskike*, the Seventh Circuit analyzed whether prisoners who were required to perform mandatory labor were employees within the meaning of the FLSA. 974 F.2d at 806-07. Relying on the economic realities test, the Seventh Circuit went on to find that the prisoners could not be employees within the meaning of the FLSA. *Id.* at 810. In dictum, the court noted that "[Congress] intended [the FLSA] to prevent unfair competition in commerce from the use of underpaid labor." *Id.* at 811. The court observed that there was some "unfair competition" that occurred in the prison setting. But applying this rationale to the prison context, the Seventh Circuit reasoned, would make little sense because all prison labor could be considered "work" that could presumably be done by a non-prisoner employee for wages, and Congress could not have intended the FLSA to cut such a "broad swath." *Id. See also Hale v. State of Ariz.*, 993 F.2d 1387, 1397 (9th Cir. 1993) ("[N]othing in the FLSA indicates that [unfair competition] alone should convert the relationship between prison and prisoner to one of employer-employee"). Rather, in *Vanskike*, the court simply noted that finding an employment relationship when a prisoner is performing required manual labor did not further the purposes of the FLSA in a way that made sense. *See Vanskike*, 974 F.2d at 811.

So too here. Applying the FLSA's rationales to Regency's students would make little sense and would cut too "broad [a] swath," just as the *Vanskike* court feared. *Any* clinical program in which students perform services might displace business from ordinary commercial endeavors operating in the same market, but the point of *Vanskike* is that even if such competition can be considered unfair, that unfairness alone does make the FLSA applicable.

Further undermining Hollins' argument in this regard is her proposed solution to the "anticompetitive effect" and "displacement" caused by Regency's performance floor: the students suggest that Regency should offer its services to the public for free, as this would result "in even more" customers for students to perform on. Pls.' Resp. at 17. But accepting as true the students' premise that charging below-market prices displaces business from licensed cosmetologists,[11] charging no fee would presumably result in ***more*** market displacement.

The simple fact is that in order to become professional cosmetologists, Regency's students are required by state law to complete a 1500 hour curriculum that includes substantial practical experience. *See* 225 ILCS 410/3-2 (1). In order to practice cosmetology techniques, the students need people who are seeking cosmetology services. The performance floor is Regency's way of ensuring that students have ample opportunity fulfill these educational requirements. DSOF ¶¶ 17, 34, 46. That Regency earns some revenue from its providing that clinical experience does not change the fundamental nature of the program. Fulfilling educational goals and licensing requirements is the purpose of any student clinical experience, and in the pursuit of that goal some displacement of business from professionals who have already obtained their license in that field will undoubtedly occur. But it would cut too "broad [a] swath" indeed to find that displacement alone rendered a student's clinical experience "employment." *See Vanskike*, 974 F.2d at 811. Doing so would fail to recognize the "economic realities" of the relationship between Regency and its students, and the educational value of the modern clinical/intern

---

[11] The students are of course assuming that the market rate for the non-licensed services of inexperienced students reflects the market price for services provided by licensed, experienced cosmetologists. This assumption is suspect, but for the purposes of summary judgment the Court will take the students' assumption as true.

experience. *Schumann*, 2015 WL 5297260, at *9 (court noting that "modern internships can play an important—indeed critical—role in preparing students for their chosen careers").

In short, Hollins' displacement argument fails because Regency's performance floor does not displace any current employees (because ***it does not have any***), it does not displace any potential employees (because ***it is forbidden from having any***), and finding an employment relationship based on regency "outcompeting" licensed cosmetologists would cut too deep (because ***it would effectively eliminate all*** student clinical services). *See Portland Terminal Co.*, 330 U.S. at 152 (court rejecting reading of FLSA that would "make all students…employees of the school or college they attended, and as such entitled to receive minimum wages.").

**7. No expectation of employment.** *Portland Terminal* and *Glatt* instruct district courts to analyze the extent to which the student and the trainer understand that the clinical experience is conducted without entitlement to a paid job at the conclusion of the program. *Portland Terminal Co.*, 330 U.S. at 153; *Glatt*, 791 F.3d at 384. If the student has an expectation that the trainer will provide her with employment or compensation at the conclusion of her clinical work, then the economic realities may be that the training program is conducted to ensure that the company's needs are met rather than for the individual benefit of the trainee. *Id.* In finding cosmetology students were not employees, other district courts have emphasized that the students had no expectation of pay or employment. *See Atkins v. Capri Training Ctr., Inc.*, No. 2:13-CV-06820 SDW, 2014 WL 4930906, at *8 (D.N.J. Oct. 1, 2014) (noting that cosmetology students had no expectation of obtaining a job with the school or getting paid for their services); *Lane v. Carolina Beauty Sys., Inc.*, No. 6:90-CV-00108, 1992 WL 228868, at *4 (M.D.N.C. July 2, 1992) (in finding student seeking her license to become a cosmetology instructor was not an employee, the court reiterated that "[s]he was neither guaranteed nor obligated to work for [the

school] after completing her course of study"). Here, Hollins readily concedes that there were no expectations that she would be employed by Regency at the conclusion of her curriculum or otherwise receive compensation. DSOF ¶¶ 79-80. She even went as far as saying it was a matter of "common sense" that they would not be paid. *Id.*

Hollins argues the absence of an overt expectancy of monetary compensation is irrelevant, and that the students were "promised non-monetary compensation for their labors by Regency, which would only allow the plaintiffs to graduate, and become eligible to take their licensing exam, if they complied with Regency's policies." Pls.' Resp. at 20. Hollins relies on *Tony and Susan Alamo Found. v. Sec. of Lab*., where the court observed that even if workers are not offered cash salaries, benefits offered expressly or impliedly in other forms, and on which the workers are entirely dependent, may nonetheless qualify as compensation for purposes of the economic realities inquiry. 471 U.S. 290, 301 (1985). In *Alamo*, the defendant was a nonprofit religious organization that derived its income largely from the operation of a number of commercial businesses; the Court held that recovering drug addicts who were staffing the defendant's businesses in exchange for food, clothing, and shelter were employees within the meaning of the FLSA. *Id.* In distinguishing *Portland Terminal*, the Court noted that there the trainees' program lasted only a week, while defendant Alamo's workers "were entirely dependent upon the [defendant] for long periods, in some cases several years." *Id.* at 301 (internal citation omitted).

There is no parallel here. There is no evidence that Regency provided anything other than *de minimis* non-monetary benefits and compensation to its students, and certainly no evidence that Hollins or other students were "dependent" on any such benefits. Hollins contends that Regency's promise to graduate students and make them eligible to take a professional licensure

examination if they completed the required program, but the award of academic credit was Regency's *quid pro quo* for the tuition that the students paid to enroll in the school, not compensation for providing discount cosmetology services.[12] There is simply no comparison between the receipt of life sustaining necessities in exchange for work at a private enterprise, as was the case in *Alamo*, to the receipt of academic credit that is given in exchange for completing a state-mandated curriculum. Academic credit hours are not "compensation" in any form, thus *Alamo* is completely inapposite here.

Analysis of the *Glatt* factors and *Portland Terminal*, then, points decisively toward a conclusion that the students, rather than Regency, were the primary beneficiaries of the requirement that they perform cosmetology and other related services on the performance floor. Hollins maintains, however, that Regency earned a substantial profit from the students' services and that this profit makes Regency the primary beneficiary of the arrangement. Pls.' Resp. at 14-18. Hollins' focus on the financial benefit Regency received from the student's services, however, does not carry the day.

As an initial matter, the record does not support a finding that Regency made a profit off the performance floor. It is undisputed that Regency generated total performance-floor revenue of $9,651,580 in 2011; $10,725,731 in 2012; and $10,700,000 in 2013. PSOF ¶ 3. Even though

---

[12] Hollins also contends that her eligibility for federal financial aid qualifies as compensation because "[s]he only qualified for that assistance by virtue of her status as a student who obeyed Regency's rules, meaning she was promised that compensation, upon which she materially depended, only if she performed work as required by Regency's benefit." Pls.' Resp. at 20. Hollins' receipt of financial aid has no bearing the economic realities inquiry as it was the government that provided her those funds, not Regency, and she could have declined to accept them. More to the point, if the receipt of financial aid were relevant then all students who receive financial aid in return for complying with school policies would be considered employees of the school they attend. Such a blanket application of FLSA coverage would be inconsistent with *Portland Terminal's* rejection of a similar blanket application of FLSA coverage.

this accounted for only 10% of Regency's total revenue, the students contend that performance floor sales accounted for 76.36% of Regency's total profits. PSOF ¶ 10. In deriving this figure, however, the students compare performance-floor **revenue** with Regency's company-wide **profit** made during the same three-year period. *Id.* The latter of course represents Regency's earnings after operating expenses are deducted, while the former does not. Even without a component for labor costs (because the students were not compensated), there were substantial costs associated with operating the performance floor: equipment, facilities, utilities, supplies, insurance, and the like. The untenable premise of the plaintiff's calculation, however, is that every dollar earned by the performance floor was pure profit. The record, however, does not permit that conclusion, or even a determination that Regency derived any profit from the operation of the performance floor.

Moreover, even if one assumes that Regency's revenues from the operation of the performance floors exceeded the costs associated with those operations, one cannot assume that Regency was the sole, or even principal, beneficiary of any such profits. What would tuition have been in the absence of whatever profits Regency derived from the operation of the performance floor? Regency may well have chosen to use any profits generated by the operations of the performance floor to defray other costs and thereby to hold tuition down—a fact that would inure, in substantial part, to the benefit of its students. Or, suppose alternatively that Regency did not earn a profit on the operation of the performance floors because it did not charge customers. Hollins argues that this would have been a preferable arrangement, yet it would almost certainly have resulted in higher tuition costs (Regency would have to cover the costs of operating the performance floors with additional revenue from some source) and it would have exacerbated a number of the ills she attributes to Regency's use of student interns. If,

for example, charging discounted rates displaces other cosmetology businesses and therefore constitutes unfair competition, as Hollins maintains, one must assume that providing free hair and makeup services would be even more objectionable.

To the extent that she relies on Regency's alleged profit, then, Hollins' argument that Regency was the primary beneficiary of Hollins' work lacks evidentiary basis. Even if it did not, whether Regency made a profit off the students' clinical work is largely irrelevant in the context of work performed by student interns who are required by law to perform supervised clinical services in order to graduate and obtain a professional license. The economic reality of the relationship between Regency and its students is that the students were engaged in their statutorily-mandated curriculum to become licensed cosmetologists while they were working on the performance floor. Any profits Regency made from those services were derivative of Regency's primary purpose: to train cosmetologists. *See Marshall*, 666 F.2d at 1327 ("The mere fact that the College may have derived some economic value from the RA program does not override the educational benefits of the program and is not dispositive of the "employee" issue."); *Solis*, 642 F.3d at 520 ("Any benefits [the vocational school] derives from its students are 'secondary to its religious mission' of providing academic and practical training. Therefore…any such benefits are 'much less' than those received by the students."); *Atkins v. Capri Training Center, Inc.*, 2014 WL 4930906, at *8 (rejecting similar argument advanced by an identical putative class of cosmetology students). Staking the existence of an employee/employer relationship on the existence of profits alone would ignore the fundamental economic reality that the work performed by Regency students was mandated by law if they wished to obtain a license to work as a cosmetologist; the students enrolled in the program for the purpose of performing that required training so that they could obtain that license. They were

therefore the primary beneficiaries of the arrangement that allowed them to complete that legal requirement. As the *Portland Terminal* Court aptly put it, "[the FLSA] cannot be interpreted so as to make a person whose work serves only his own interest an employee of another person who gives him aid and instruction."  330 U.S. at 152.

***

In short, Regency's students were just that—students. That Regency may have made some profits off the performance floor does not undermine that fundamental relationship. Nor is it of consequence that the performance floor may have drawn customers away from commercial salons where they would have had to pay full-market price. Where the profit, or other benefit to the school, is only derivative the students' need for the clinical experience in the first instance, the work performed by the student is primarily performed for the benefit of the student, not the school. In such a case, the school is not an "employer" within the meaning of the FLSA and Regency's motion for summary judgment is therefore granted.

Date: October 27, 2015

_____

John J. Tharp, Jr.

United States District Judge